WOMEN'S COMMITTEE FOR EQUAL EMPLOYMENT OPPORTUNITY (WC = EO) et al., Plaintiffs,

v.

NATIONAL BROADCASTING CO. et al., Defendants.

No. 75 Civ. 6030–LFM.

United States District Court, S. D. New York.

Aug. 31, 1977.

See also 71 F.R.D. 666.

---

Blank, Goodman, Rone & Stanley, New York City, for plaintiffs by Janice Goodman and Nancy E. Stanley, New York City.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for defendants National Broadcasting Co., Inc., RCA, Inc. and NBC by Howard L. Ganz, Sara S. Portnoy and Jonathan L. Sulds, New York City.

Sturm & Perl, New York City, for defendant Local 11 by Jerome Y. Sturm, Stephen H. Sturm and W. Harvey Mayer.

Spivak, Rosenman & Spivak, New York City, for defendants Local 1, Local 4 and Local 644 by Steven B. Spivak, New York City.

Howard N. Meyer, New York City, for defendant Local 771.

Edward J. Quinlan, New York City, for defendant Local 52.

Sue E. Eisenberg, Trial Atty., Equal Employment Opportunity Commission, Washington, D. C., for Intervenor.

MacMAHON, District Judge.

Plaintiffs in this sex discrimination class action apply for approval of a proposed settlement, pursuant to Rule 23(e), Fed.R. Civ.P. We conclude that the total settlement package is fair, reasonable and adequate and represents an equitable resolution of the issues raised by the action. Accordingly, we approve the settlement, although, as discussed below, we have reservations about one aspect of the settlement providing for a separate fund to be distributed only to the named plaintiffs.

Plaintiffs brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., on behalf of themselves and other past, present and future women employees of defendant National Broadcasting Co., Inc. (NBC) and NBC's local broadcast station in New York, WNBC. The complaint alleges that the defendant companies and unions maintained patterns, practices and policies of discrimination against women in matters of job placement, salaries, promotions, training and various other benefits and conditions of employment.

On July 30, 1976, we certified the class action under Rule 23(b)(2), Fed.R.Civ.P., and granted intervention by the Equal Employment Opportunity Commission (EEOC) to protect the public interest in this case, which the EEOC had certified as a case of general public importance. See 42 U.S.C. § 2000e–5(f)(1). Class members were notified by direct mail of the pendency of the action and of their right to have counsel of their own choosing represent their interests, yet no class member availed herself of this right.

Discovery and settlement negotiations proceeded simultaneously, and this proposed settlement was reached on the eve of the trial, after full opportunity for counsel to develop the relevant facts and make an informed judgment as to the merits of the case on both sides. Class members were notified, again by direct mail, of the proposed settlement and its terms, and of the opportunity for class members to express any objections to the settlement at a public hearing, which we held on May 6, 1977. No class member appeared at the hearing to object to the settlement.[1]

The proposed settlement takes the form of a consent decree signed by plaintiffs, plaintiff-intervenor EEOC, and defendants NBC, WNBC and RCA Corporation (NBC's parent corporation). We will refer to all three corporate defendants collectively as "NBC." Although certain unions representing NBC and WNBC employees are also named as defendants, plaintiffs have agreed to discontinue the action against the unions in the event we approve the consent decree.

I.

As usual in cases requiring judicial approval of a settlement, our function is not to try or to decide the ultimate issues of the case, but merely to evaluate the settlement in comparison with the likely rewards of continuing the litigation, taking into account (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action throughout the trial, (7) the ability of defendants to withstand a greater judgment, (8) the "range of reasonableness" of the settlement in light of the best possible recovery, (9) the "range of reasonableness" of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir. 1974). See also *United States v. Armour & Co.,* 402 U.S. 673, 681, 91 S.Ct. 1752, 29 L.Ed.2d 258 (1971); *Feder v. Harrington,* 58 F.R.D. 171 (S.D.N.Y.1972).

1. But see n. 3, *infra.*

We have examined the consent decree with these factors in mind and find that settlement on the proposed terms is fully warranted, particularly since the consent decree provides, in some measure, nearly every aspect of relief prayed for in the complaint. The only demand not satisfied by the consent decree is mandatory benefits for pregnancy-related disability, a claim the plaintiffs have abandoned in light of the Supreme Court decision in *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), which held that the Constitution does not require companies to provide such benefits.

As we have already noted, the case was very near the trial stage when this settlement was reached, and virtually if not all pre-trial discovery had been completed, a factor favoring counsel's estimate of the likely rewards of continuing the litigation. In addition, the reaction of the class to the proposed settlement must be considered remarkably favorable, since no class member chose to have counsel of her own choosing appear in the action, nor did any class member appear to object to the settlement at the hearing. Continued litigation would certainly have proven complex, expensive, protracted, and at some risk, since proof of plaintiffs' claims, particularly the damage claim, was far from assured. Even as to liability, NBC was prepared to defend on the factual issue of the available pool of qualified women to fill the various vacancies occurring from time to time throughout NBC even if there had been no discrimination.

Plaintiffs, on the other hand, had accumulated discovery material relating to specific instances of discrimination (primarily involving the sixteen named representative plaintiffs) and were also prepared to offer statistical evidence and computer data concerning the work force at NBC, in an effort to demonstrate the existence of "across-the-board" discrimination against women. As plaintiffs concede, there would undoubtedly have been conflicting viewpoints from expert witnesses, including statisticians and labor economists, presenting sharply disputed issues of fact. Plaintiffs suggest that trial of the liability issues alone might well have required one to two months, and while we express no opinion on that estimate, suffice it to say that plaintiffs certainly did not have an open and shut case on liability.

Furthermore, assuming that plaintiffs could have proven liability, they faced a much tougher task on damage questions. As we indicated when we certified the class, we would try the liability case first, and if plaintiffs prevailed it would be incumbent on every member of the class to come forward and show how, and to what extent, she had been damaged. 71 F.R.D. at 671. Discovery revealed that there were approximately 2,700 class members, and the complexity, expense, and length of time involving in a case-by-case analysis is obvious, possibly requiring years of protracted litigation. Moreover, as we discuss more fully below in connection with our comparison of the benefits of the settlement compared to the risks of litigation, even if NBC did maintain patterns and practices of discrimination, it is by no means clear that every member of the class suffered personal loss on account of such acts.

## II.

We turn now to the consent decree itself, in an effort to determine whether the proposed settlement terms fall within the "range of reasonableness" in light of possible recovery after continued litigation. In general, the consent decree provides for a broad-range affirmative action program, designed to bring more women into previously male-dominated management and technical positions, to improve the salaries and job assignments in the primarily-female clerical positions, and to provide for a more open, documented personnel system. The following provisions provide the bulk of the program:

### *Job Evaluation and Upgrading.*

NBC will cause to be continued and completed an objective job analysis and evaluation study now underway by an independent consulting firm, with a view to revis-

ing and upgrading the salary structure of clerical and secretarial positions (now occupied mainly by women), considering significant job duties or functions not presently accounted for in the salary grading structure. Any changes to salary gradings resulting from the evaluation will be reviewed by a Joint Committee of six members, three appointed by NBC and three by plaintiff Women's Committee for Equal Employment Opportunity (WC = EO). If the Joint Committee cannot agree by majority vote, the disputed matters will be submitted for arbitration, but any undisputed changes in salary grades will be implemented immediately. If the study should recommend that some positions be downgraded, the salaries of the incumbents in those positions would not be reduced. A similar job analysis and evaluation will be undertaken for the executive, managerial and professional positions, and the Joint Committee will be advised of the progress and results of that study.

In our view, this portion of the consent decree provides a significant measure of injunctive relief which could not have been obtained even after a full trial on the merits. This provision responds to plaintiffs' claim that clerical and secretarial employees, as a group, are under-rated and underpaid in view of the duties and responsibilities exercised by many of these employees. Plaintiffs' ability to prevail on this claim is doubtful at best. In fact, the only case we have located which discussed this type of job-group undervaluation was decided unfavorably to plaintiffs' position. *Christensen v. State of Iowa,* 417 F.Supp. 423, (N.D. Iowa 1976), *appeal docketed,* No. 77–1071 (8th Cir. Jan. 21, 1977). Moreover, the provisions for an extensive job-by-job analysis, accompanied by close internal monitoring by the Joint Committee and the arbitration provisions, are clearly the most appropriate way to resolve this issue and go far beyond any relief we could have ordered by way of injunction.

*Affirmative Action Goals and Timetables.*

The consent decree establishes percentage goals, with timetables for meeting the goals, for minimum utilization of women in higher level management positions. These include overall utilization percentages by salary grades, plus particular percentage goals within specified divisions. For example, there is an overall goal of 35% women in salary grades 19–21, with no less than 30% women in the TV Network Division, 25% in the Finance Division, and 20% in the News Division. Similar goals are established for the other salary grades in official and manager and/or professional job categories. These percentage goals represent objectives which the parties have agreed are obtainable by good faith effort by 1981, and giving due weight to the judgment of counsel in negotiating these goals, see *Flinn v. FMC Corp.,* 528 F.2d 1169, 1173 (4th Cir. 1975); *Blank v. Talley Industries, Inc.,* 64 F.R.D. 125, 132 (S.D.N.Y.1974), we consider these goals eminently reasonable.

### *"Fill-rate" Goals.*

The consent decree also provides minimum "fill-rate" goals whereby NBC must hire women to fill 33–45% of future vacancies in specified entry-level technical positions, namely NABET TV Assistant 1A (permanent and temporary), News Feature and Desk Assistant, and Newswriter.[2] NBC must also make a good faith effort to assign female newswriters to network news programs and to give them producer or associate-producer assignments. In addition, NBC agrees to train and place at least one woman per year in technical positions in the new field of electronic journalism. These provisions of the consent decree respond directly to plaintiffs' claim that technical positions have been available only, or primarily, to men, and appear to us to represent a reasonable and fair resolution of that issue, since the specified percentage of openings in those positions must be made available to women.

**2.** This section of the consent decree provides a caveat that the fill rate goals will not take effect until the expiration of recall rights of

employees laid off as a result of the discontinuance of NBC's News and Information Service.

### Back Pay.

NBC has committed $540,000 for lump sum back pay to women who had been on staff in non-union-represented positions for at least three years prior to December 31, 1972. Eligible women who remained at NBC until March 28, 1977 (the date that notice of the settlement was mailed to the class) will receive $1,000 each, while women who left the company before that time (with at least five years of service prior to termination) will receive $500 each. While the formula established will definitely operate to exclude some class members from sharing in the back pay award, we think the proposed distribution is equitable under the circumstances and is based on reasonable assumptions concerning the availability of promotional opportunities to women with varying lengths of tenure during the past 7½ years.

For example, the three-year minimum service requirement was selected on the basis that, in the normal course of events, neither male nor female employees could expect to be promoted until he or she had been on staff for three to four years. Accordingly, it is reasonable to conclude that women with less than three years of employment would not have been deprived of promotional opportunities solely because of her sex, while women with longer terms of service would be more likely to have suffered from the alleged lack of opportunities. The cut-off date of December 31, 1972 was selected because, in plaintiffs' view, at least some affirmative action measures affording women greater opportunities were instituted after the filing of administrative complaints on February 7, 1973, and women employed for three years after that date benefited from those increased opportunities. NBC suggested using the earlier date of December 31, 1972, since its year-end reports are the most accurate employment records, allowing a more precise determination of eligibility.

We find this formula to be reasonable and justified under the circumstances, particularly since back pay claims of the class are by far the most speculative. First, it is clear that not all 2,700 members of the class could have been promoted even in the absence of discrimination. Discovery revealed that during the period 1972–75, there were 890 hirings into the professional, administrative and official job categories. Even assuming that one-third of those positions should have gone to women but for discrimination (a sharply disputed issue), only about 300 of those opportunities should have gone to women. Second, because of NBC's decentralized and largely informal and undocumented personnel system, records are not available to indicate which women employees applied for and were rejected for specific job opportunities, and which may or may not have been qualified for the positions sought. Thus, this is not a case like *United States v. United States Steel Corp.*, 520 F.2d 1043, 1055 (5th Cir. 1975), where lines of progression, job qualifications and bidding procedures were well-defined, permitting an historical reconstruction and a flow-chart of the workforce which would then provide a reasonable basis for computing individual entitlement to back pay. Where determination of individual damages is speculative, as in this case, a class-wide approach to back pay is appropriate. As the court noted in *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 261 (5th Cir. 1974), "when the class size or the ambiguity of promotion or hiring practices or the multiple effects of discriminatory practices or the illegal practices continued over an extended period of time calls forth [a] quagmire of hypothetical judgment . . . a class-wide approach to the measure of back pay is *necessitated.*" (Emphasis added.)

The back pay damages of this class are even more speculative on account of the requirement in this circuit that entitlement to back pay be supported by proof of actual application and rejection for a position. See *EEOC v. Local 638 and Local 28 of the Sheet Metal Workers' International Alliance*, 532 F.2d 821, 832 (2d Cir. 1976). Under the proposed settlement, however, some class members will benefit from the back pay award even though they cannot supply proof of application and rejection without

cause, especially if they did not apply simply because they believed it would be futile. While the actual amounts distributed may be lower than some women would be entitled to if computed individually, it should be noted that the essence of a compromise is giving up a litigable right for a lesser but assured measure of relief. See *United States v. Armour & Co., supra,* 402 U.S. at 681, 91 S.Ct. 1752. We find the class-wide back pay award to be a fair and reasonable resolution of a highly contestable issue under the circumstances of this case.

### Front Pay.

NBC will allocate $860,000 to a fund for "Affirmative Action Promotion and Reclassification Adjustments." Under this portion of the consent decree, any woman who has been or will be promoted to or within the official and managerial and/or professional job categories since July 1, 1976 will receive an additional salary increase (above the usual promotional increment), to adjust her salary to the same level as men with five years of NBC service in the grade to which she is promoted.

A similar form of "upward" pay adjustment will be applied to women in clerical positions who are upgraded as a result of the job evaluation study we discussed above. Under both categories of "front pay," the fund will be charged only for the first year's salary increase, yet NBC will continue to pay the increases (with accompanying fringe benefits) throughout the promoted or upgraded woman's tenure at NBC. Plaintiffs estimate the total value of this salary adjustment program at more than $3 million, taking into account the continuation of the increases and fringe benefits (estimated at 15% of salary). While we have no concrete basis for the estimate of total value, which depends largely on which women will be promoted into which positions and how long they remain at NBC, suffice it to say that the overall monetary impact of the front pay provision will be well in excess of the $860,000 allocated for the first year's increase.

Here again, we must conclude that the provision for prospective salary adjustments is reasonably calculated to benefit those women who have most likely suffered from lack of opportunities in the past, and it certainly falls within the "range of reasonableness" required for settlement, in view of the highly speculative nature of each individual woman's damages.

### Changes in NBC's Personnel System.

NBC will institute changes in its overall personnel system, providing for company-wide posting of job vacancies, annual written performance appraisals of both men and women employees, plus written criteria for merit or promotional salary increases. In addition, if a male is selected for a position for which a female has applied, the hiring official must set forth in writing the reasons for the selection.

In our view, these revisions respond directly and reasonably to plaintiffs' complaints that women were discriminated against by previous word-of-mouth recruiting, subjective, undocumented, and, therefore, largely unreviewable criteria for various personnel decisions. In short, the status of men and women in the personnel structure at NBC will now be governed by the same articulable standards and will be exposed to the light of day.

### Monitoring and Reporting.

As we have indicated, NBC's compliance with the terms of the consent decree is subject to review by the Joint Committee appointed by NBC and WC = EO. NBC must also provide release time, up to $25,000 per year and $125,000 overall, to those women employees who serve on the Joint Committee as WC = EO representatives. NBC is also obligated to report annually to counsel for plaintiffs and the EEOC on the progress of the various affirmative action measures contained in the consent decree. In the event some measures have not been fully satisfied, NBC must report specially on the reasons for such failure, and counsel for plaintiffs will have the opportunity to examine all the relevant records at NBC.

In our view, this provision for constant monitoring of NBC's compliance with the consent decree, by persons within the company and fully familiar with its operation, goes far beyond any the court could hope to accomplish and significantly improves upon whatever relief plaintiffs might have recovered after trial.

## III.

Thus far, we have no difficulty concluding that the proposed settlement fairly, reasonably and adequately resolves the issues raised in the complaint. We think the mandatory provisions for revisions in the personnel system, analysis and upgrading of primarily-female clerical jobs, and minimum fill rate and utilization goals and timetables all combine to ensure that women employees at NBC will be able to compete for jobs, promotions, transfers and merit salary increases on a par with males. The provisions for back pay and front pay contribute significantly to compensate those women most likely to have suffered from alleged deprivations of equal employment opportunities in the past. These portions of the settlement, responding in detail to almost every measure of relief sought, compare favorably, indeed in some cases surpass the relief obtainable if plaintiffs had established a clear-cut entitlement to injunctive relief upon a trial.

Accordingly, since proof of liability was in some doubt and the consent decree provides as much or more of what plaintiffs could have obtained after a clear victory on liability, settlement on these terms is appropriate and equitably resolves the claims of the class without the risk, expense and time required by a trial of these issues. *City of Detroit v. Grinnell Corp., supra,* 495 F.2d at 463.

As we have indicated earlier, however, one aspect of the settlement providing for a separate fund of $200,000 to be distributed to WC = EO and the sixteen individual named plaintiffs causes us great concern, although we conclude that on the unique facts of this case it need not upset the otherwise plainly appropriate settlement embodied in the consent decree. Plaintiffs propose to distribute $30,000 of the total to WC = EO to meet its past and future expenses in prosecuting this action and in meeting its continuing obligations under the consent decree. The remaining $170,000 will be distributed unequally to the sixteen individual plaintiffs, on the basis of each plaintiff's allegedly demonstrable damage claims.

Counsel have submitted detailed work histories for all sixteen individual plaintiffs, purporting to show specifically how each was damaged by the lack of equal employment opportunities at NBC, including repeated rejections for promotions, transfer or merit salary increases for which each had applied and was qualified. They calculate their aggregate individual damages at $236,000, and the $170,000 to be distributed would satisfy approximately 71% of each plaintiff's claim. The proposed distributions range from $1,336 to $35,174, with an average of approximately $11,000. Plaintiffs would not participate in any other monetary recovery under the consent decree.

In our view, when representative plaintiffs make what amounts to a separate peace with defendants, grave problems of collusion are raised. Plaintiffs in class actions undertake to represent not only themselves, but *all* members of the class, in a fiduciary capacity, and are obligated to do so fairly and adequately, and with due regard for the rights of those class members not present to negotiate for themselves. But when named plaintiffs are willing to sign a consent decree granting them all or virtually all—71% for example—of what they seek, a serious question arises as to whether the interests of the class have been relegated to the back seat. Under such circumstances, the court must be especially wary of approving the settlement, in view of its role under Rule 23(e) as guardian of the rights of the absent class members.

Plaintiffs assert that the separate payment to them is appropriate because, while the monetary claims of the class as a

whole are speculative, those of the individual plaintiffs are non-speculative, and are fully supportable by their individual grievances. Plaintiffs are unable to cite any reported decision specifically addressing and adopting this proposition. They do, however, refer us to a number of cases, mostly unreported, involving class action settlements where the named plaintiffs have received a "bonus" over and above any awards to the general class.

Thus, plaintiffs argue in effect, the courts have implicitly adopted the principle that individual plaintiffs need not necessarily share on exactly the same terms as other class members, but may be "rewarded" for bringing and successfully concluding a lawsuit under Title VII. See, for example, *Thornton v. East Texas Motor Freight,* 497 F.2d 416, 420 (6th Cir. 1974), where the court noted: "We also think there is something to be said for rewarding those drivers who protest and help to bring rights to a group of employees who have been the victims of discrimination." Similarly, in *Bryan v. Pittsburgh Plate Glass Co.,* 59 F.R.D. 616, 617 (W.D.Pa.1973), the court approved a settlement containing special awards to "those members of the plaintiff class who were most active in the prosecution of this case and who devoted substantial time and expense on behalf of the class." Finally, as the Supreme Court has recognized, Congress has determined that enforcement of the Civil Rights Act is to a great extent entrusted to "private attorneys general," and plaintiffs should be encouraged to bring private actions to further the policies of the Act. See, *e. g., Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968).

It is undoubtedly true that the prospect of a substantial personal recovery will encourage aggrieved persons to bring lawsuits which are likely to advance the national policy of eliminating discrimination in employment. The same prospect may, however, run afoul of the named plaintiff's duty to negotiate fairly on behalf of *all* members of the class. We simply cannot say in any given case whether a settlement would be agreed to by the representative plaintiff if he or she were to share in any award on the same terms as everyone else. If that were the general rule, courts would certainly have a much stronger indication of the acceptability of the settlement, especially where, as here, the benefits accorded the whole class are not strictly quantifiable in monetary terms.

There are numerous factors present in this case, however, which convince us that this consent decree should be approved, notwithstanding our doubts about a general policy of awarding class representatives a settlement on terms different from the other class members.

First, as we have indicated, the parts of the settlement that accrue to the entire class afford significant monetary and injunctive relief, covering every available aspect of relief sought in the complaint, which if standing alone would merit our approval.

Second, the likelihood of collusion is minimized by the presence in the case of the EEOC, which has intervened to protect the public interest, has participated fully in the settlement negotiations, and has fully endorsed the consent decree as proposed, including the separate settlement of plaintiffs' individual claims.

Third, no class member chose to appear on her own behalf in the lawsuit, nor did any class member voice objections at the hearing on the settlement.[3] We must con-

3. Although no objectors appeared at the hearing, we have received two objections by letter. One relates to a claim by Mary McNulty Sternfeld that she should have been included as a named plaintiff on account of her early activities in support of plaintiff WC = EO's efforts to eliminate sex discrimination at NBC. We certainly have no control over the selection of parties plaintiff who choose to file a lawsuit, and in any event we note that she does not object specifically to any terms of the settlement, either as they apply to the class or to the named plaintiffs. Insofar as her letter may be read as objecting to separate treatment for named plaintiffs, as we note in text, this was a matter of great concern to the court, but we have concluded that the settlement is nevertheless fair, reasonable and adequate.

clude from this that class members as a group do not feel that the settlement is inadequate, nor that they are offended by the notion that plaintiffs, who have carried the litigation throughout, are to receive 71% of their individual claims.

Fourth, the consent decree does not foreclose the individual discrimination claim of any woman who had, as of March 28, 1977, pending charges of discrimination before the EEOC, New York State Division of Human Rights, New York City Commission on Human Rights, or any other judicial or administrative forum. Thus, any woman who felt strongly enough about her claim of discrimination to have taken this affirmative step will not be precluded from continuing and/or concluding her individual claim.

Fifth, plaintiffs here instituted significant measures and undertook significant obligations, perhaps at some risk to job security and good will with coworkers, resulting in broad-ranging benefits to the class. These measures and obligations include organizing and funding WC = EO, retention of counsel, filing and prosecution of administrative complaints, and eventually compliance with defendants' discovery requests, including submission to depositions and responding to voluminous interrogatories, all of which were destined to form the core of plaintiffs' case, and undoubtedly contributed to defendants' willingness to settle on these terms rather than continue the litigation.

Sixth, in addition to general public policy in favor of amicable settlement of legal disputes, cooperation and voluntary compliance are especially favored in Title VII cases. See *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 45, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

One other purported objector, Mary McAndrew White, filed objections and a Notice of Intention to Appear some six weeks after the hearing. In addition to the untimeliness of this objection, it is plainly without merit since she concludes incorrectly that there is no provision for continued monitoring of NBC's compliance, and that the settlement would "relieve defendants of any obligation to comply with the law."

■ In short, while we cannot endorse the principle that named representative plaintiffs should be allowed, as a general rule, to base their recovery on specific damage claims while denying that right to the remainder of the class, the many factors noted above combine to dispel the cloud of collusion which such a settlement suggests, and compel our approval of the consent decree.

We conclude, therefore, that viewed as a total package, the proposed consent decree is fair, reasonable and adequate for the protection of the class, and we approve it.

### Counsel Fees.

■ NBC has also agreed to pay plaintiffs' counsel fees up to $150,000, plus disbursements up to $75,000, subject to approval by the court. Under the standards set forth in *City of Detroit v. Grinnell Corp., supra,* 495 F.2d at 470, we must base any fee award on the number of hours actually expended by counsel on the case, multiplied by a reasonable hourly rate for attorneys of like skill in this area.

■ In this connection, counsel have submitted, and we have examined, detailed affidavits listing 1,544 hours by partners, at $100 per hour, and 206 hours by a first-year associate, at $40 per hour, for a total of $162,640 billable attorneys' time. We find both the number of hours expended and the hourly rates to be reasonable, taking into account the nature and complexity of the case, qualifications of counsel, and the results achieved. Since counsel are requesting a fee award of less than their straight billable time, there is no need to consider any "risk factor bonus." *City of Detroit v. Grinnell Corp., supra,* 495 F.2d at 471; *Barnett v. Pritzker,* 73 F.R.D. 430, 433 (S.D.N. Y.1977).

As our discussion of the settlement itself clearly indicates, the internal monitoring procedures are extensive, and the settlement in no way relieves NBC of its obligation to comply with the law. Furthermore, to the extent that Ms. White appears to be objecting to ongoing acts of discrimination against her, we note that the proposed consent decree does not settle any claim arising after March 28, 1977.

Accordingly, we approve the award of fees to plaintiffs' counsel, to be paid by defendant NBC, in the amount of $150,000. We also approve the payment of disbursements in the amount of $40,671.32. While this figure seems high at first blush, we have concluded that the amount is reasonable, being comprised in large measure of the costs of many depositions of all named plaintiffs plus numerous officials of NBC, expert witness fees, as well as reproduction of numerous interrogatories and answers, NBC documents and computer data, and court documents, all of which required multiple reproduction for distribution to the many parties in the case.

So ordered.