Roderick **PLUMMER**, Raymond W. Armorer, Neville F. Caesar, Gwendolyn Moore, and all others similarly situated, Plaintiffs,

v.

**CHEMICAL BANK**, Defendant.

**80 Civ. 7364 (WCC).**

United States District Court,
S. D. New York.

July 10, 1981.

Vladeck, Elias, Vladeck & Engelhard, P. C., New York City, for plaintiffs; Judith P. Vladeck, Joseph J. Garcia, Richard S. Corenthal, New York City, of counsel.

Epstein, Becker, Borsody & Green, New York City, for defendant; Richard M. Green, Susan Schenkel-Savitt, Elliot J. Groffman, New York City, of counsel.

Silverman & Harnes, New York City, for objectors Herman I. Taitt, Louis Straker, Herman L. Clark, James Morrison and Miguel A. Oppenheim; Sidney B. Silverman, Joan T. Harnes, New York City, of counsel.

Jose A. Rivera, Brooklyn, N. Y., for objector Theodore L. Ferguson.

## OPINION AND ORDER

CONNER, District Judge:

This is a purported class action on behalf of all present and future black officials, managers and professionals employed by defendant in New York City, brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. Plaintiffs and defendant seek court approval, pursuant to Rule 23(e), F.R.Civ.P., of a Consent Decree entered into between the parties. For the reasons which follow, the motion for approval of the proposed settlement is denied.

*Background*

In the spring of 1979 several Black employees contacted plaintiffs' counsel, Judith P. Vladeck, in connection with alleged discriminatory employment practices of Chemical Bank impairing the career opportunities of all defendant's black employees in

official, managerial and professional positions. Having satisfied herself that these claims of differential treatment appeared meritorious, Ms. Vladeck, in or about August 1979, commenced negotiations with counsel for defendant, with the hope of reaching an agreement "which would avoid the conventional litigation procedures," Affidavit of Judith P. Vladeck in Support of Approval of Consent Decree, February 9, 1981, at 3.

Against this background of continuing negotiations, the four named plaintiffs filed complaints against defendant with the Equal Employment Opportunity Commission ("EEOC") in November and December 1979. Each charged that he or she had been discriminated against in salary, promotion opportunities, transfer and other employment conditions on account of race, and that defendant discriminates against all Black employees in the same fashion. In September 1980, each of the plaintiffs obtained "right to sue" letters from the EEOC.[1] At that time, counsel for plaintiffs and counsel for defendant had agreed that all of the issues in this litigation would be resolved by presenting a proposed consent decree for judicial approval. *Id.* at 6.

On December 24, 1980, the complaint in the instant action was filed, alleging a pattern of discrimination against Black employees with respect to all terms and conditions of employment. The complaint also contains specific allegations as to defendant's actions with respect to each of the plaintiffs, such as failure to promote plaintiffs in comparison with white employees, salary discrepancies relative to comparable white employees, demotions, failure to carry out promised promotions and assignments to positions inferior to those held by white employees. Both damages and equitable relief are sought.

On February 10, 1981, without moving for certification of a class, plaintiffs moved for approval of the proposed Consent Decree. On February 11, the Court ordered that notice of the proposed settlement be sent to each class member.[2] The notice sent advised the purported class of the benefits to the class from the settlement, the requirement of a general release, the right to appear and object to the settlement at a court hearing and the right to opt out of the class. The notice did not explain that each of the four plaintiffs was to receive substantially more benefits under the Consent Decree than would other members of the class.

On April 3, 1981, a hearing was held before the Court at which both proponents of, and objectors to, the settlement were heard. After expressing reservations regarding approval of the Consent Decree, the Court set a schedule to allow both proponents and objectors the opportunity to make additional submissions. Because of the notoriety of this action among Black employees of defendant, no additional notice regarding the additional benefits to be received by the named plaintiffs was ordered, but additional time to object or opt out was permitted.

Following this additional period, there are twenty-five opt-outs out of a class in excess of 500 individuals. Not all who opted out did so because of any dissatisfaction with the settlement; some indicated other reasons for requesting exclusion. In addition, ten class members filed timely objections and fifteen individuals requested that Sidney B. Silverman, attorney for five objectors, advise the Court of their identity and their opposition to the proposed settlement. Those who have affirmatively voiced dissatisfaction with the Consent Decree thus total between five and ten percent of the class.

---

1. Apparently no other member of the purported class has filed charges with the EEOC against defendant.

2. The proposed Order submitted by plaintiffs also contained a provision which recited "[s]ubject to the final approval of the Court of the proposed Consent Decree, the Court finds the amount agreed to by the parties as plaintiffs' attorneys' fees and costs as set forth in Section XXII of the said Consent Decree to be reasonable." The Court excised this paragraph prior to signing the Order.

*The Proposed Consent Decree*

The major provisions of the proposed Consent Decree may be summarized as follows:

Part IV. All class members who fail to opt out of the class are deemed to have released defendant from any claim of employment discrimination on account of race arising out of acts or omissions of defendant prior to the date of entry of the Decree.

Part V. The Decree expires three years after it becomes effective. If the Promotion Fund or Scholarship Fund created by Part VIII of the Decree has not been exhausted by the time the Decree expires, defendant may either continue those programs until the Funds are completely expended or distribute the unexpended monies *pro rata* to prior recipients.

Part VII. For each relevant job category, the Decree sets a "goal," which is a percentage figure representing the target proportion of Black employees in each category. The figures are derived, at least in part, from defendant's existing affirmative action program, which originated in 1975. It is not clear what has been added to defendant's existing program by the Decree. Defendant is obligated to make a "good faith" effort to meet these goals, and to document such effort. Compliance therewith is to be measured by the totality of circumstances incident to hiring and placement.

Part VIII. Defendant agrees to establish a $300,000 fund for promotion payments. Any class member who, during the life of the Decree, is promoted into or within any "underutilized job group" (a term apparently used to describe job categories in which minority hiring goals have not been met), will receive a promotion payment provided such class member's years of employment with defendant exceed by two or more years the average total number of years of service, at the time of promotion, of the white employees receiving a comparable promotion into or within such job group during the previous calendar year. Payments range from $1500 to $4500, depending upon the excess of the number of years

of employment of the class member in comparison with the average of previously promoted white employees.

Defendant also agrees to establish a $100,000 fund for scholarship payments, to be used for any educational or training purpose selected by defendant and the eligible class member. Any class member who is promoted into or within an underutilized job group is eligible for a scholarship payment in the amount of $1000.

Defendant's obligations to make promotion and scholarship payments terminates upon expiration of the funds, even if this occurs prior to the running of the duration of the Decree. Furthermore, no class member may obtain any promotion or scholarship payment without generally releasing defendant from liability for any act of employment discrimination occurring up to the date of the release, even though such act postdates the Decree.

Part IX. Defendant agrees to take certain steps to assist Black employees in their careers with defendant, including, for example, certain recruitments efforts directed at Blacks, training supervisors regarding equal employment opportunities, encouraging Black employees to take advantage of existing training programs, giving annual performance evaluations and providing notice of and counseling regarding job vacancies.

Part X. Defendant agrees to appoint an Ombudsman for the assistance of class members with job-related complaints arising under the Decree. The Ombudsman may make recommendations to defendant's Human Resources Division, and then to defendant's president.

Part XXI. Each of the four named plaintiffs obtains all the benefits provided to the class generally. In addition, each plaintiff receives a job promotion, and at least two of these promotions appear to involve salary increases. Finally, the four plaintiffs are to receive payments totaling $53,500.

Part XXII. Defendant agrees to pay plaintiffs' counsel's fees in the amount of $65,000, plus any additional fees due for services rendered after February 10, 1981.

438

*Discussion*

■ In passing upon a proposed settlement of a class action, the court is not to decide the merits of the controversy. *E. g., Carson v. American Brands, Inc.,* 450 U.S. 79, 101 S.Ct. 993, 998–99 n.14, 67 L.Ed.2d 59 (1981). The court's review is solely to determine whether the settlement is fair, reasonable and adequate from the perspective of absent class members. *E. g., Newman v. Stein,* 464 F.2d 689, 691–92 (2d Cir.), *cert. denied,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972). The court should consider the complexity, expense and likely duration of the litigation, the reaction of the class to the settlement, the stage of the proceedings and the amount of discovery completed, the risks of establishing liability, the risks of establishing damages, the risks of maintaining the class action through the trial, the ability of the defendants to withstand a greater judgment, the range of reasonableness of the settlement fund in light of the best possible recovery and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir. 1974).

■ Consideration of these factors compels the Court reluctantly to conclude that the proposed Consent Decree cannot be approved. This conclusion follows as a consequence of three subordinate conclusions: (1) the record upon which plaintiffs seek to justify the settlement is inadequate, (2) the negotiation of this settlement was premature and unauthorized, and (3) the settlement provides substantially greater benefits for named plaintiffs than it does for class members. Each of these will be addressed in turn.

1. Inadequacy of the Record

■ The most important factor in gauging the fairness, reasonableness and adequacy of a class settlement is the strength of the case for plaintiffs on the merits, balanced against the amount offered in the settlement. *West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710, 740 (S.D.N.Y.1970),

*aff'd,* 440 F.2d 1079 (2d Cir. 1971). The record in this case is grossly deficient with respect to any evaluation of the strength of plaintiff's case on the merits.

Plaintiffs' original submission in support of the settlement offered only the conclusion of counsel that, after speaking with many class members, she became satisfied that the case had potential merit. Despite the invitation of the objectors, and the additional opportunity provided by the Court, plaintiffs' supplemental submission did little better. Plaintiffs' counsel offered her conclusion that statistics would reveal a *prima facie* case of disparate impact, but no statistics or summaries thereof have been presented. Instead, counsel has conclusorily advised the Court that "this Court could conceivably have ruled that the groupings of the Bank's employees are such that plaintiffs' statistical presentation would not withstand refutation." Plaintiffs' Reply Memorandum in Support of Proposed Consent Decree, May 12, 1981, at 26. Beyond this, the Court has been advised only that Title VII and Section 1981 have statutes of limitations, that allegations of continuing violations need not be accepted by the Court and that individuals seeking damages under Title VII must exhaust administrative remedies.

This presentation evidences only that counsel is aware of the obstacles facing any and all plaintiffs in employment discrimination cases, but no serious attempt has been made to evaluate the strength of the case of these plaintiffs and the absent class members. This leaves many unanswered questions: What evidence is there to support the particular charges of the four named plaintiffs regarding promotions, job assignments and salaries? If these charges can be supported, what evidence is there that such discrimination is indicative of a pattern of discrimination against all class members? What statistical evidence is there of disparate impact? What contentions would defendant offer to explain any evidence of disparate impact? Are such contentions legally sufficient defenses? What evidence is there to support or refute

such defenses? What institutional aspects, if any, of defendant's employment practices are responsible for the discriminatory consequences which can be proved? What impact do the statutes of limitation and the "continuing violation" doctrine have upon the factual circumstances of these class members? What would be the average range of recovery for class members if individual actions for back pay were prosecuted? None of these questions is addressed to any significant degree with respect to the particular factual circumstances of these class members and this case.

Moreover, the conclusion is inescapable that the failure to present a satisfactory record stems from the even more objectionable failure of plaintiffs and their counsel to investigate these issues seriously prior to committing themselves to negotiating a settlement "which would avoid the conventional litigation procedures." The record indicates that there has been no formal discovery at all in this case. Plaintiffs point out that informal discovery may be an adequate substitute for such formal discovery, and argue from this premise that they have obtained sufficient information to conclude a fair settlement by way of negotiations with, and through the cooperation of, defendant. The problem with plaintiffs' position is that there is no indication that the acquired information was the equivalent of information available through formal discovery in preparation for trial. Any information which would be damaging to defendant on the merits is unlikely to have been disclosed voluntarily by defendant during the course of negotiating and drafting a consent decree. And indeed, the virtual nonexistence of any factual presentation upon which the Court can evaluate the strength of plaintiffs' case on the merits supports the conclusion that this settlement has been negotiated and proffered to the

Court for approval on the basis of a woefully inadequate exploration of the possible results of litigation.

In determining that there is an insufficient basis for finding the proposed Consent Decree to be fair, reasonable and adequate, the Court is not unmindful that the class members are thereby deprived of the benefits of the Decree with no promise of superior or even similar benefits in the future. Nevertheless, approval of a class settlement on this record would amount to an abdication of the Court's responsibilities under Rule 23(e). Indeed it is difficult to envision a more barren record upon which a court could be asked to measure the risks and advantages of continued litigation.

Plaintiffs' counsel's effort to resolve litigation by compromise is admirable, frequently productive, generally appreciated by the courts and, except in a class or stockholders' derivative action, beyond their scrutiny. But Rule 23 places substantial limitations upon the ability of class representatives and their attorneys to compromise causes of action on behalf of nonappearing class members.[3] The power to surrender the claims of class members depends upon the adequacy of the consideration obtained in return therefor under the settlement agreement. Absent a sufficient basis for measuring the approximate value of the claims, there can be no responsible finding that the settlement is fair, reasonable and adequate.

### 2. Unauthorized Negotiations

Plaintiffs' counsel began negotiations with defendant in the summer of 1979 on behalf of over 500 present Black employees and an additional number of future Black employees. Manifestly, counsel was not authorized to negotiate by each of the class members.[4]

---

**3.** *United Steel Workers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), upon which plaintiffs rely, speaks only to the propriety of private affirmative action agreements, and in no way suggests that settlement of Title VII class actions need not meet the standards for approval generally applicable under Rule 23(e).

**4.** Counsel for plaintiffs consulted with many class members and determined that this action is potentially meritorious. It is not explained nor is it apparent why no other class members filed charges with the EEOC.

Moreover, plaintiffs appear to have purposely avoided compliance with the Rule 23 requirements for certification of a class and of representatives to act on its behalf. Although plaintiffs first met with counsel in the spring of 1979, and although settlement negotiations commenced that summer, plaintiffs did not file charges with the EEOC until November and December 1979. And although plaintiffs obtained "right to sue" letters in September 1980, this action was not commenced until December 24, 1980, apparently the last working day on which plaintiffs could file suit.[5]

Once this action was commenced, plaintiffs never moved for class certification. Instead the parties put the finishing touches on the Consent Decree and moved for its approval on February 10, 1981.

In short, the apparent intent of the parties has been to strip the Court of its role in class actions as prescribed by Rule 23. Plainly, as the objectors have succinctly stated, this action was filed solely to obtain the judicial imprimatur necessary to bind absent class members to an agreement negotiated by self-appointed representatives.

Section 1.46 of the Manual for Complex Litigation (1980) at 59 cautions that

> "[c]are should be taken to avoid undesirable, premature, unauthorized settlement negotiations in class actions. Before any settlement negotiations occur, there should be a class action determination. Therefore, all settlement negotiations on behalf of the class should be conducted by counsel representing the class in the litigation."

The Manual takes this position because of the inherent pressures upon plaintiffs' counsel to act in harmony with the defendant in reaching a settlement, lest the defendant choose to negotiate with someone else and counsel lose the fees and prestige associated with appointment as attorney for the class; only the court-appointed representative operates free of this potential conflict. See also *Ace Heating & Plumbing*

*Co., Inc. v. Crane Co.*, 453 F.2d 30, 33 (3d Cir. 1971).

■ The issue is not, as plaintiffs' counsel treats it, whether there is any evidence of actual collusion. Admittedly, there is no such evidence here. The scrutiny must be directed rather to the degree of adherence of plaintiffs and their counsel to the procedures prescribed by Rule 23 and the case law. The reason for this is two-fold. First, evidence of actual collusion is unlikely to materialize even where collusion takes place. Second, since the court is not to try the case on the merits, one of the limited inquiries a court can make under Rule 23(e) is whether plaintiffs and their counsel have placed themselves in the best position from which to negotiate a settlement on behalf of the class. Pre-certification settlements fall short of this standard, and raise substantial questions concerning the adequacy of such settlements.

■ Despite this danger, courts on occasion have approved settlements which have been negotiated prior to class certification. This is properly done, however, only where the court takes special care to assure itself that the settlement is fair, reasonable and adequate in light of the unauthorized, premature negotiations. In other words, the fact that a settlement is agreed upon prior to class certification is a factor weighing against approval of the settlement, but the settlement may nevertheless be approved if there are other significant indicia that it is fair, reasonable and adequate.

This, however, is not a case where the settlement may nevertheless be approved. The reasons for this conclusion are:

(1) the problem of pre-certification negotiations is particularly troublesome here, where the settlement had been substantially formulated prior to the commencement of the action;

■ (2) the existence of premature, unauthorized negotiations is particularly egre-

---

5. 42 U.S.C. § 2000e–5(f)(1) provides that a complaint must be filed within ninety days af-

ter the EEOC issues the Notice of Right to Sue.

gious where, as here, plaintiffs and their counsel appear to have purposely delayed the commencement of this action in order to avoid being pressured by the Court into moving for class certification before negotiations were concluded. An attorney's impatience with "the conventional litigation procedures" is not justification for the avoidance of the safeguards provided by Rule 23; and

(3) consideration of other relevant factors disfavors, rather than favors, approval of the settlement, see Part 1, *supra*, and Part 3, *infra*.

### 3. Disproportionate Benefits

Simply stated, the benefits to class members under the Consent Decree are dwarfed by the benefits to the named plaintiffs. The "Goals" portion of the Decree is substantially derived from defendant's preexisting affirmative action program. In fact, objector Theodore Ferguson claims that all of the equitable relief set forth in the Decree, except for the addition of an Ombudsman, is substantially derived from defendants' preexisting affirmative action program, a charge which has neither been documented nor denied.

As for the Ombudsman and the other avenues for class members to pursue grievances, the Decree with one provision takes away what it provides with another provision. While emphasizing to the Court the opportunities class members will have to pursue grievances, the proponents of the Decree have neglected to mention that, before any class member receives any promotion or scholarship payment, he must release defendant from liability for any discriminatory act *up to the date of the release*, including, obviously, acts postdating the Decree. From the point of view of the individual class member, he is required by the Decree to give up his claim against defendant in exchange for no certain employment advantage; then, *if* he is promoted and *if* there is a significant discrepancy between his tenure and that of similarly promoted white employees, he is eligible for promotion and scholarship payments, but

only if he once again gives up any claim he has against defendant which has arisen since the Decree.

As to the promotion and scholarship payments, defendant has committed a total of $400,000 to the class. There are presently over 500 class members, and that number will presumably increase with the addition of Black employees during the life of the Decree. The payments thus average out to less than $1,000 per class member. Obviously many class members will receive nothing. And there is no guarantee that the individuals most entitled to compensation will receive anything, since it is defendant's act of promotion which triggers entitlement to a portion of the class funds.

By comparison, each of the named plaintiffs is to receive all of the benefits generally available to all class members *and* actual promotions *and* any raises in salary incident to such promotions *and* monetary awards of $10,000, $8,500, $17,500 and $17,500, respectively. Plaintiffs' counsel are to receive $65,000 plus additional fees for services after February 10, 1981.

The objectors argue that the named plaintiffs should not receive any more in settlement than other class members. The proponents of the settlement argue that the named plaintiffs in Title VII class actions may merit additional benefits because they have taken substantial career risks in bringing the action and because only they have exhausted administrative remedies, that settlements providing such additional benefits to the named plaintiffs in Title VII cases have been judicially approved, albeit primarily in unreported rulings, that here there was no conflict of interest because the terms of the class settlement were negotiated prior to the provisions governing individual relief for plaintiffs, and that any class member who objects to the additional benefits conferred upon plaintiffs may opt out of the class.

■ Where representative plaintiffs obtain more for themselves by settlement than they do for the class for whom they are obligated to act as fiduciaries, serious

questions are raised as to the fairness of the settlement to the class. The existence of an ability to opt out of the class does not lessen this concern; otherwise, court approval of a class settlement would not be required where opt-out instructions are sent to class members. Nor does the chronology of negotiations avoid the appearance of unfairness and the specter of a conflict of interest. From a defendant's perspective, a relatively "soft" tentative class settlement may induce generosity in subsequent negotiations with the named plaintiffs.

 While there may be circumstances in which additional benefits to the named plaintiffs may be justified, such disparities must be regarded as *prima facie* evidence that the settlement is unfair to the class, see *Franks v. Kroger Co.*, 649 F.2d 1216 at 1226 (6th Cir. 1981) and a heavy burden falls on those who seek approval of such a settlement, see *Women's Committee for Equal Employment Opportunity v. National Broadcasting Co.*, 76 F.R.D. 173, 180–81 (S.D.N.Y.1977). Under the circumstances of this case, the existence of these disproportionate benefits is a substantial factor leading to the Court's conclusion not to approve the proposed settlement.

Here the disparity between the benefits to the class and to the named plaintiffs is substantial. A small but significant minority of class members has vociferously objected to this precise feature of the Decree. No showing has been made that the claims of the named plaintiffs are superior to those of other class members, except for the fact that the named plaintiffs have exhausted their administrative remedies. And the risks of bringing suit for Title VII plaintiffs are not significantly more serious than those run by other class action plaintiffs.[6]

In short, the record indicates little justification for the grossly disparate benefits. The existence of such a discrepancy, in combination with the circumstances under which the Decree was negotiated, see Part 2, *supra*, and the inadequacy of the record created by the settlement proponents, see Part 1, *supra*, mandates disapproval of the proposed Consent Decree.

*Conclusion*

The motion for approval of the proposed class action Consent Decree is denied.

SO ORDERED.

---

**6.** Several of the objectors have indicated their willingness to prosecute a class action on behalf of this class while promising to forsake any additional individual relief beyond that obtained for the class.