In re U.S. BIOSCIENCE SECURITIES LITIGATION

No. 92–0678.

United States District Court,
E.D. Pennsylvania.

Nov. 10, 1992.

Sherrie R. Savett, Berger & Montague, P.C., Robert P. Frutkin, Savett, Frutkin, Podell & Ryan, P.C., Philadelphia, Pa., for plaintiff.

Richard Ben–Veniste, Greg A. Danilow, Weil, Gotshal & Manges, Washington, D.C., for defendant.

Richard L. Jacobson, Fulbright & Jaworski, Washington, D.C., for defendant, James E. Moore.

## MEMORANDUM

DALZELL, District Judge.

Plaintiffs are individuals who purchased common stock or call options, or sold put options, of U.S. Bioscience from April 12, 1991 through January 31, 1992. They bring this action on their own and as representatives of a class against U.S. Bioscience, Inc. ("Bioscience") and several of its officers and directors, alleging violations of the federal securities laws and negligent misrepresentation.[1]

All defendants except James E. Moore filed a motion to dismiss portions of plaintiffs' complaint for failure to state a claim upon which relief can be granted and for failing to satisfy the pleading requirements of Fed.R.Civ.P. 9(b). James E. Moore filed his own motion to dismiss, proffering arguments similar to the other defendants'.

In the motions to dismiss, defendants seek dismissal of most of plaintiffs' claims. At oral argument on October 16, 1992, however, the defendants abandoned several of the arguments in their motions. Tr. of oral argument at 9–10, 25–29. What remain are defendants' requests that we dismiss plaintiffs' claims against the outside directors (Jonah Shacknai, Maxwell Gordon, Allen Misher and Moore) and John Toy, and that we strike several paragraphs from the complaint for failure to plead with requisite particularity or, under Rule 12(f), for immateriality. Tr. of oral argument at 9–10.

By these motions, as amended by the gloss made at the oral argument, defendants raise important issues regarding the extent of scienter that may legitimately be inferred or imputed in cases under the federal securities laws. As will be seen, notwithstanding the substantiality of defendants' arguments on both motions to dismiss, we do not believe ourselves to be at liberty to embrace them at this early stage.

## I. *Background*

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we must take all allegations contained in the complaint as true and construe them in a light most favorable to the plaintiff. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989); *Rocks v. City*

---

1. After we consolidated twenty-five actions under Fed.R.Civ.P. 42(a), plaintiffs filed a 58–page revised consolidated class action complaint (referred to herein as "the complaint"). We have since consolidated another action under the master action. The parties have stipulated to the withdrawal of the negligent misrepresentation claim, and, subject to our disposition of these motions, they have stipulated to the certification of the class. *See* October 16, 1992 Stipulation and Order re Class Certification; November 3, 1992 Stipulation and Order re Class Certification.

   The officers and directors named as defendants in the complaint are Dr. Philip Schein, Robert I. Kriebel, Maxwell Gordon, Allen Misher, Patrick J. McCarthy, Jonah Shacknai, Dr. William McCulloch, Barbara J. Scheffler, Paul Davignon, Dr. John Toy, and James E. Moore.

*of Phila.*, 868 F.2d 644, 645 (3d Cir.1989). Those allegations are as follows.

Plaintiffs allege in their complaint that U.S. Bioscience is a pharmaceutical company specializing in the development and marketing of chemotherapeutic drugs for treating patients with cancer and related maladies. Through licensing agreements, Bioscience acquired the rights to develop and market ten drugs that the company believed would be effective in treating cancer and allied diseases. The most promising of these drugs was Ethyol, a chemotherapy and radiation therapy protective agent. It was this drug, and the prospects for its approval by the United States Food and Drug Administration (FDA), that was the engine for the market price of Bioscience stock, which was and is traded on the American Stock Exchange.

Plaintiffs contend that defendants knew about the importance of Ethyol to the market value of the company, and, in order to drive up the stock price, issued, or permitted to be issued, many false and misleading statements regarding the efficacy of Ethyol and its prospects for FDA approval. Plaintiffs claim that these misrepresentations artificially inflated the price of Bioscience stock during the class period, and allowed all of the individual defendants in this action, except *Moore* and *Kriebel*, to realize handsome gains by selling Bioscience stock during that time.[2]

Plaintiffs identify several allegedly false and misleading statements in their complaint. Many of these statements appear in the company's April 12, 1991 report on Securities and Exchange Commission Form 10–K (the "10–K"). The company reported in the 10–K that "Ethyol has exhibited what the Company believes is a unique capability to prevent or reduce the most serious side effects … of the major forms of both chemotherapy and radiation therapy." Complaint ¶ 80. Another statement

in the 10–K reads: "Ethyol has been tested as a chemotherapy protective agent in over 20 clinical trials involving more than 450 patients. Data from these trials indicates that Ethyol can reduce … toxicities." Complaint ¶ 84. Plaintiffs contend that these statements, along with others in the document, were false and misleading because the clinical trials for Ethyol had not produced the stated results. They also allege statements in the 10–K were false and misleading that suggested that the "clinical trials" comported with Food and Drug Administration protocol when, plaintiffs aver, they did not comply with FDA protocol.

Plaintiffs also cite one allegedly false and misleading statement made by defendant Schein, the President, CEO and Chairman of the Board of Directors of Bioscience. Complaint ¶¶ 44, 99. They allege that at a conference of securities analysts in San Francisco on November 19, 1991, Dr. Schein announced, "[t]he FDA called us yesterday and told us to put clinical trials on hold; they are taking us to the first available panel hearing." *Id.* Plaintiffs contend that this statement was false because the FDA had not in fact directed that the company put the trials on hold. They allege that it was misleading because the FDA only directs that clinical trials be halted when the results are so positive that it would be unethical to deprive the control group patients of the benefits of the drug under investigation. As evidence of the statement's materiality, plaintiffs note that on the day of the conference, the announcement appeared in the *Wall Street Journal* and Bioscience stock rose dramatically to $47⅛ from $39⅝, where it had closed the day before. Complaint ¶ 100. Moreover, the stock continued to rise until November 21, 1991, when it closed at $62¾, a 58% increase in price in three days. *Id.*[3]

Finally, plaintiffs point to certain allegedly false and misleading statements made by

---

**2.** Each defendant's gross proceeds from the sale of stock during this period are as follows: Gordon—$653,150; Misher—$348,750; Shacknai—$991,200; Toy—$581,250, Schein—$14,427,221; Scheffler—$1,410,691; McCarthy—$6,329,258; Davignon—$1,485,902; McCulloch—$2,537,270. These proceeds total $26,764,692. Complaint

¶¶ 44–52. The class period is from April 12, 1991 through January 31, 1992. Complaint ¶ 62.

**3.** A two-for-one stock split occurred on December 26, 1991.

Robert Kriebel, Bioscience's Senior Vice-President of Finance and Administration and the Treasurer of the company. In May of 1991, Kriebel announced that "Ethyol may be marketed during the latter part of 1992, pending FDA approval." Complaint ¶ 90. In November, 1991, he also stated that "we're quite anxious to see the new system [at the FDA] speed up the approval process for this drug." Complaint ¶ 98. Plaintiffs contend that these statements contributed to the overall false impression that the officers and directors of Bioscience were optimistic about the prospect for early FDA approval.

Far from granting early approval to Ethyol, the FDA Advisory Committee late on January 31, 1992, rejected the drug for prompt human use because "the clinical trials required by the FDA failed to demonstrate statistically significant evidence of the efficacy of Ethyol" (Complaint ¶ 6). The bubble burst. On the next trading day [4] Bioscience fell $16 to close at about $17, Complaint ¶ 7, a loss of market capitalization of over $320 million in a matter of hours.

The first suits were filed by the close of business that day.

## II. *Discussion*

As noted above, defendants significantly narrowed the scope of their motions to dismiss at oral argument on October 16, 1992. They now request that we (1) dismiss paragraphs 80 through 89 which enumerate allegedly false and misleading statements in the 10–K for failure to state a claim or meet the minimum requirements of Fed.R.Civ.P. 9(b); (2) dismiss the case as to Gordon, Misher, Toy, Moore and Shacknai for failure to plead scienter in compliance with Fed.R.Civ.P. 9(b); (3) dismiss paragraphs 90 and 98, which contain allegedly false and misleading statements by defendant Kriebel, because the statements therein cannot be the basis for actionable misrepresentations under the securities laws; and (4) dismiss paragraphs 109 and

110 and a portion of paragraph 7 which contain statements by securities analysts because the statements therein are immaterial. *See* Tr. of oral argument at 9–10.

In order to avoid dismissal on a 12(b)(6) motion, a complaint must satisfy the pleading requirements of Rule 9(b). Fed. R.Civ.P. 9(b). That rule provides:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

*Id.* In securities fraud cases under § 10(b) of the Securities and Exchange Act, Rule 9(b) requires that a plaintiff plead "(1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 284 (3d Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992).

Recognizing that application of Rule 9(b) in securities law cases "may permit sophisticated defrauders to successfully conceal the details of their fraud", *Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96, 100 (3d Cir.1983), and that "[p]articularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs", *Shapiro*, 964 F.2d at 285 (quoting *In re Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 645 (3d Cir.1990)), courts have "relaxed the [particularity] rule when factual information is peculiarly within the defendant's knowledge or control." *Id.* In the case at hand, the plaintiffs are outside shareholders of Bioscience, or traders of Bioscience options, and the defendants are insiders of the company.[5] Therefore, it is beyond doubt that the factual information needed

---

4. January 31, 1992 was a Friday.

5. As will be seen, these defendants are, as alleged in the complaint, individuals with sophist-

ication and experience in the pharmaceutical industry.

for the plaintiffs to plead with particularity is peculiarly within the control of the defendants, and Rule 9(b)'s pleading requirements should be relaxed, as *Shapiro* requires.

### A. The 10–K

Plaintiffs first request is that we dismiss paragraphs 80 through 89 of the complaint which pertain to Bioscience's 10–K filing for the fiscal year ending December 31, 1990. In those paragraphs plaintiffs identify several statements contained in the 10–K that they allege to be false and misleading in violation of the federal securities laws.

Defendants contend that the plaintiffs have failed to meet the pleading requirements by failing to plead with particularity that the earmarked 10–K statements are materially false and misleading. The statements, defendants argue, must be read in conjunction with the entire text of the 10–K which also contains several "cautionary" remarks regarding the potential for FDA denial of approval for Ethyol. For example, the document states that "[s]ubmission of an [new drug application] does not assure FDA approval for marketing. The application review process takes more than two years on the average." 10–K at 24. The defendants contend that, when read in conjunction with the cautionary remarks, the allegedly false and misleading statements are no longer misleading as a matter of law.

Moreover, defendants aver that the statements are not material. They point out that the company issued the 10–K on April 12, 1991, five months before it had filed a new drug application for Ethyol and a full seven months before the market price of Bioscience skyrocketed in November of 1991. Tr. of oral argument at 15. This, they appear to assert, establishes that the statements had no material effect on the market perception of Ethyol and did not affect the stock price, the ultimate barometer of materiality.

The additional cautionary statements that defendants cite from the 10–K are inconsequential at this point in the proceedings. As noted above, our Court of Appeals requires that we "accept as true all the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the nonmoving party." *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir.1989). Dismissal is not appropriate unless it appears "certain that plaintiffs can prove no set of facts which would entitle them to relief." *Craftmatic, supra*, 890 F.2d at 634.

■ Applying this standard of liberality to evaluate the plaintiffs' complaint, we must conclude that plaintiffs have alleged sufficient facts to withstand the defendants' motions. The reasonable inferences drawn from the plaintiffs' complaint is that defendants artfully incorporated the misleading statements into the 10–K in order to set the stage for their future fraud. Moreover, although there was not immediate market reaction to the issuance of the 10–K, we cannot conclude at this early stage that the statements had *no* effect on market opinion and therefore were not material. Discovery may well prove otherwise, but until it does, we must apply the relaxed pleading requirements as *Craftmatic* requires and accept the allegations in the complaint as true.

### B. Misher, Gordon, Shacknai, Toy and Moore

The defendants' second request is that we dismiss plaintiff's claims as to defendants Misher, Gordon, Shacknai, Toy and Moore. These defendants' liability is principally grounded in two types of statements, those in the 10–K and those spoken by defendant Kriebel. The defendants argue that we must dismiss these defendants from the case because the plaintiffs have failed to allege that these defendants had the requisite scienter for a securities fraud claim. Specifically, they assert that the plaintiffs have failed to allege with particularity that there was a culpable connection between these defendants and the allegedly false and misleading statements.

### 1. 10–K

■ With regard to the statements in the 10–K, the "group published information" doctrine applies. That doctrine holds that in cases involving false and misleading publications, plaintiffs may satisfy the pleading requirements simply by alleging that an individual defendant signed a publication containing misstatements. *See, e.g., Blake v. Dierdorff,* 856 F.2d 1365, 1369 (9th Cir.1988); *Kramer v. Scientific Control Corp.,* 365 F.Supp. 780, 791 (E.D.Pa. 1973) (holding that the fact that outside directors signed registration statement provides adequate basis for pleading their liability). These cases presume that such publications are the result of collective action and, therefore, they conclude that a court can attribute knowledge of all of the misstatements therein to those who sign such documents.

■ With regard to the four outside directors who signed the 10–K (Misher, Moore, Gordon and Shacknai), Complaint ¶ 80, however, the defendants point to two recent cases from the Northern District of California that exclude outside directors from the group publication presumption. *See Xoma Corp. Securities Litigation,* [Current Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,491, 1990 WL 357807 (N.D.Cal. Dec. 27, 1991); *Smith v. Network Equipment Technologies, Inc,* [Current Binder] Fed. Sec.L.Rep. ¶ 95,659, 1990 WL 263846 (N.D.Cal. October 19, 1990). Defendants principally rely on *Xoma,* which states that outside directors cannot fall within the group pleading presumption unless they are involved in the "day-to-day management" of the company and "have access to information more akin to a corporate insider". *Id.* at 92,160.

*Xoma,* however, is not binding on us and we do not find its reasoning to be persuasive in the circumstances here. Outside directors can be of two very different kinds. The paradigmatic outside director is, say, a college president who sits on the Board of a large corporation, owns 100 shares of its stock, and attends a Board meeting four times a year. When the outside director is of this type, the *Xoma* rationale makes a good deal of sense because such directors cannot be expected to engage in the day to day management of the company and must necessarily rely exclusively on officers' reports in Board decision making. Such a director's role on the Board is not intended or expected to be of a hands-on variety.

Here, however, the outside directors are of an entirely different profile. All of the outside director defendants in this case are alleged to have experience in the pharmaceutical industry. Gordon and Shacknai are Chief Executive Officers of pharmaceutical companies. Complaint, ¶¶ 45, 46. Misher is a college president, but he is the President of the Philadelphia College of Pharmacy. Complaint, ¶ 46. Misher also serves as a $25,000 per year consultant to Bioscience. *Id.* Moore is alleged to sit on the Board of Directors as the designee Marion Merrell Dow, a New York Stock Exchange-listed pharmaceutical that owns seventeen percent of Bioscience. Complaint ¶ 53. Although Moore points out that he is not a scientist, we must infer from plaintiffs' complaint that a seventeen percent shareholder in a start-up company would not appoint someone to safeguard its multimillion dollar interests in the company who did not have a great deal of expertise.[6]

Because the outside director defendants have valuable expertise in Bioscience's industry, it is unreasonable, at least in the present procedural context, to assume that they were ceremonial figures who did not understand the workings of the company. Moreover, because Bioscience is a relatively small start-up company with only forty people in the entire enterprise, each officer

---

**6.** As Mr. Moore's attorney acknowledged at oral argument: "[T]he duties of an outside director are to take reasonable steps to review representations made by the "insiders;" to vote on various issues put before the Board; to ask questions at board meetings and so forth." Tr. of oral argument at 71. Given the great financial stake Marion Merrell Dow has in Bioscience, we believe such "reasonable steps" would be much greater than would be "reasonable" from a director less financially or institutionally interested. It is worth recalling that, at its peak price, this seventeen per cent interest in Bioscience had a market value in excess of $100 million.

and director can be expected to bear more responsibility and have greater knowledge of the venture than an officer or, especially, director in a large, well-established corporation. *See* Tr. of oral argument at 42. This conclusion seems doubly confirmed here by the wildly disproportionate capitalization the market attributed to the efforts of this small band, which was, at its peak, in excess of $600 million for a company that had never made a dollar's profit. Therefore, instead of presuming that the outside directors were uninvolved as *Xoma* suggests, our presumption under these circumstances should be the opposite, and more akin to what is typical with inside directors.

Construing the allegations in the complaint in the light most favorable to the plaintiffs, we must conclude that the defendants were not simply figureheads on the Bioscience Board. A reasonable inference drawn from reading the complaint as a whole is that the defendants used their expertise and inside status closely to monitor Bioscience's dealings and safeguard their sizeable personal or institutional investments in this volatile new company. Under the circumstances, we cannot in this procedural context relieve the defendants of all potential liability for the statements in the 10–K, and we must deny their motion to dismiss the claims arising from those statements.

▆ Even with regard to Dr. Toy, who did not sign the 10–K, we are not persuaded to dismiss plaintiffs' claim attributing responsibility to him for the alleged misrepresentations in that document. Because Dr. Toy is an inside officer serving as Bioscience's Vice–President of Clinical Research and Development in Europe, we must infer from the complaint that he was aware of the results of the research in progress and was consulted regarding public statements about that research. Moreover, because Dr. Toy was also a significant shareholder in the company, owning at least 15,000 shares of stock according to the plaintiffs,[7] *see* Complaint ¶ 52, he had the utmost interest in the viability of, and

enhancing public interest in, the Bioscience drugs under development. Although he was a resident of London at the time the other defendants signed the 10–K, his dual interest in Bioscience warrants the inference that he used all possible modes of communication (*e.g.,* telephones and FAX machines) to remain in close touch with the other officers of the company. For the purposes of the motion to dismiss, therefore, we must infer from the complaint that he was aware of the allegedly false and misleading statements in the 10–K.

### 2. Dr. Schein's Statement

▆ The second basis for attributing liability to defendants Misher, Gordon, Shacknai, Toy and Moore is to hold them accountable for Dr. Schein's allegedly false and misleading statement in November of 1991. As with the 10–K statements, defendants claim that plaintiffs have failed to allege with particularity any culpable connection between Dr. Schein's statement and the other defendants, and they request that we relieve the other defendants of any liability for Dr. Schein's statement. For the following reasons, we will deny this request also.

As discussed above, on November 19, 1991, Dr. Schein announced at a conference of securities analysts in San Francisco that "[t]he FDA called us yesterday and told us to put clinical trials on hold; they are taking us to the first available panel hearing." Complaint ¶ 99. Although none of the moving defendants was present at the conference, the *Wall Street Journal* published the statement in its late afternoon edition. *Id.* More importantly, the stock price rose dramatically on the very same day, and 58% in only three days. Shacknai, Misher and Gordon each sold 5,000 shares of stock in the company, for total proceeds of $917,500, on November 20, 21 and 22, respectively. *See* Complaint ¶ 112. Within the next two weeks, Gordon sold another 5,000 shares for $344,400. *Id.*

Because Misher, Gordon and Shacknai sold large blocks of stock immediately after Dr. Schein's statement was reported in

---

7. Dr. Toy sold 15,000 shares on October 2, 1991, for $581,250. Complaint ¶ 112.

the national financial press, we must infer at this point in this litigation that they had scienter. Moore and Toy, however, did not "communicate" their knowledge by action or word. Moore did not even personally own Bioscience stock, and although Dr. Toy did, plaintiffs do not allege that Dr. Toy sold any of his stock after Dr. Schein's statement was published.

■■■■ Nevertheless, because of Moore's and Toy's positions in Bioscience, we must infer scienter at this threshold stage. We may fairly conclude on the pleadings that Moore, the designee of Marion Merrell Dow, a seventeen percent shareholder in Bioscience, energetically represented Marion Merrell Dow's interests in the company. He could hardly do so by blinding himself to developments that so explosively affected Bioscience's stock price and added 58% to the value of Marion Merrell Dow's investment in the company. Similarly, we infer from the same record that Dr. Toy, an insider director of Bioscience who owned shares and served as a Vice–President of Clinical Research, kept abreast of company developments and protected his own interests in the company. One could conclude that both individuals were aware of the spectacular divergence of Bioscience's intrinsic and market values, and therefore made it their business vigilantly and scrupulously to follow the progress of the company's FDA fortunes. Because of the unique circumstances of these defendants' involvement, we infer on motions to dismiss that Moore and Toy were aware of the unusual market advance of Bioscience stock and diligently investigated its cause.

Overall, while we agree with defendants that ¶ 56 of the Complaint's "Each defendant acted with an awareness of the primary wrongdoing" is, by itself, too vaporous an allegation of scienter, the particular averments as to each defendant give sufficient flesh to infer the requisite state of mind for each of them.

## C. Kriebel's Statements

Defendants also ask that we "prune" the complaint to delete certain statements that they say cannot be the basis for actionable misrepresentations. Specifically, they ask that we "prune" statements from paragraphs 90 and 98 of plaintiffs' complaint which contain two allegedly false and misleading statements by Kriebel[8] and paragraphs 109 and 110 as well as portions of paragraph 7[9] which contain statements made by securities analysts. At this stage of the proceedings we do not believe we are authorized to do so.

■■■■ With regard to Kriebel's statements, defendants aver that there are no circumstance under which we could find the statements to be false and misleading. On this basis, they request that the statements be stricken from the complaint. As noted above, paragraph 90 alleges that Kriebel stated that "Ethyol *may* be marketed during the latter part of 1992, pending FDA approval" (emphasis added) and paragraph 98 alleges that he said that the company was "quite anxious to see the new system [at the FDA] speed up the approval process for [Ethyol]."

Objectively, neither of these statements is untrue. As plaintiffs note, however, when read in the context of the other allegations in the complaint, the two statements could take on less innocent meanings. According to the plaintiffs, when Kriebel stated that Ethyol *"may* be marketed" in 1992, he already knew that approval was not forthcoming, at least not in 1992. The statement therefore misleads the public into thinking that approval in 1992 was a genuine possibility when, as plaintiffs would have it, Kriebel knew it was not.

---

8. These paragraphs provide, in pertinent part:

  90. In May, 1991, defendant Kriebel stated that Ethyol may be marked during the latter part of 1992, pending FDA approval....

  *   *   *   *   *   *

  98. ... On November 14, 1991, defendant Kriebel represented "we're quite anxious to see the new system [at the FDA] speed up the approval process of this drug," referring to Ethyol....

9. These paragraphs quote extensively from investment firms about the analysts' views of the materiality of the FDA's adverse decision of January 31, 1992.

Similarly, with the second statement, plaintiffs maintain that Kriebel's implication about the new expedited FDA process was to lead the investing public to a belief that Kriebel expected early approval. Plaintiffs allege that this was false and misleading because Kriebel knew that early approval was unlikely. Plaintiffs' claim that this statement has a deceptive air seems to us to grasp at a straw. At this early stage of the proceedings, however, we feel compelled to leave the complaint intact. The plaintiffs will have the opportunity to establish the statement's falsity and materiality through discovery, and if they cannot do so, the defendants can renew their request in a motion for summary judgment.

### D. Securities Analysts' Statements

As for the statements of the securities analysts that defendants claim are immaterial under Rule 12(f),[10] tr. of oral argument at 10, we are also inclined to leave them in the complaint. The statements cited are various reactions of securities analysts to the information that the FDA had not approved Ethyol. The analysts believed that the news had "severely undermined the credibility of both the drug and [Bioscience]." Complaint ¶ 109. "Most shockingly," Kidder Peabody said, "the FDA revealed that Ethyol's much-heralded 'fast-track' review arose from the company's own attempt to gain approval based on interim Phase III data, rather than any special FDA interest in the drug." *Id.*

While these statements themselves may be immaterial, plaintiffs included them in the complaint in order to establish the materiality of the other allegedly false and misleading statements. The securities analysts' reactions to Bioscience's allegedly false and misleading statements regarding Ethyol are indicia, albeit not dispositively, of the materially misleading nature of the statements. They therefore have a role to play in the complaint and should not be stricken.

### III. *Conclusion*

As noted at the outset of this Memorandum, we believe defendants' motions raise serious questions about the extent of outside directors' vicarious liability for the statements (or omissions) that others make. At this early stage of the proceedings, however, we regard it as premature to prune either parties or claims in the perhaps unusual context here. Given the complaint's allegations about the defendants, and given our duty under *Craftmatic* to make every inference in plaintiffs' favor, we do not feel at liberty to follow the path defendants and the district court in *Xoma* illuminate for us. This is particularly so given the extent of alleged insider selling, and the familiarity with the pharmaceutical industry that the defendants share.

For all of these reasons, we are constrained to deny defendants' motions to dismiss.

---

10. Rule 12(f) provides: "Upon motion made by a party before responding to a pleading, or if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous material." Fed.R.Civ.P. 12(f).