**In re U.S. BIOSCIENCE SECURITIES LITIGATION.**

Civ. A. No. 92–678.

United States District Court,
E.D. Pennsylvania.

May 27, 1994.

As Amended June 1, 1994.

See also 150 F.R.D. 80.

---

5. No public entity or public policy issue is implicated by the terms of the Stipulation.

Sherrie R. Savett, Philadelphia, PA, Richard H. Weiss, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, Stuart H. Savett, Toby P. Camen, Barbara A. Podell, Savett, Frutkin, Podell & Ryan, P.C., Philadelphia, PA, Robin F. Zwerling, Zwerling, Schachter & Zwerling, New York City, for Douglas Simmons, Jill Simmons and David Jaroslawicz.

John J. Soroko, Duane, Morris & Heckscher, Philadelphia, PA, Henry T. Reath, Philadelphia, PA, Richard Ben–Veniste, Weil, Gotshal & Manges, Washington, DC, for Philip S. Schein.

John J. Soroko, Duane, Morris & Heckscher, Philadelphia, PA, Henry T. Reath, Philadelphia, PA, Richard Ben–Veniste, Greg A. Danilow, Weil, Golshalt Manges, Washington, DC, for U.S. Bioscience Inc.

Lois W. Davis, Asst. U.S. Atty., James G. Sheehan, Asst. U.S. Atty. Civ. Div., Philadelphia, PA, for U.S.

Richard Ben–Veniste, Weil, Gotshal & Manges, Washington, DC, for Maxwell Gordon, PH.D., Allen Misher, PH.D., Patrick J. McCarty, Jonah Shacknai, Barbara J. Scheffler, Paul Davignon, John Toy, PH.D., Robert I. Kriebel and William McCulloch, DR.

## MEMORANDUM

DALZELL, District Judge.

On April 6, 1994, we approved the settlement of this consolidated class action. The settlement provided for the payment of $5,250,000 in cash, plus interest from January 31, 1994, and $10,000,000 in marketable securities, consisting of units composed of U.S. Bioscience common stock and warrants.[1]

Beside approving the settlement, we were also asked to approve requests for attorneys' fees and cost reimbursements, as well as to make "incentive awards" to thirty-five class representatives. We shall consider these fee requests and "incentive awards" separately.

*Attorneys' Fees*

On the same day as we approved the settlement, we appointed the Honorable Arlin M. Adams as Special Master to prepare a Report and Recommendation on the appropriate fee percentage to award plaintiffs' counsel for their labors in this litigation. No less than thirty-four firms applied for counsel fees from the class settlement, as well as three other firms who sought fees as part of the resolution of the derivative claims asserted in the consolidated amended complaint.[2]

■ In appointing Judge Adams as Special Master, we directed him to be guided by the recommendations set forth in the October 8, 1985 report of the Third Circuit Task Force, "Court Awarded Attorney Fees," 108 F.R.D. 237 (the "Task Force Report"). Notwithstanding the eminence of its parentage,[3] we have found no decision of the Third Circuit formally embracing the Task Force Re-

---

1. The common stock of U.S. Bioscience is traded on the American Stock Exchange, and the warrants will also be listed for trading on that Exchange.

2. With respect to derivative counsel's fee petitions, we ordered that counsel for U.S. Bioscience review those petitions, and after doing so we were advised that the reviewers took no exception to derivative counsel's fee petitions. On April 15, 1994, we ordered the payment of the fees requested, without adjustment to the "lodestar".

3. Former Third Circuit Chief Judge Aldisert appointed Judge M. Lee Sarokin as Chairman of a Committee of ten distinguished lawyers and District Court judges. Professor Arthur R. Miller of Harvard Law School was Reporter.

port.[4] We therefore will briefly explain why we have chosen to apply the Task Force Report's recommendations here.

The Task Force Report concluded that in "common fund" or, as it refers to it, "fund-in-court" cases such as this class action, a percentage of recovery fee is preferable to a "lodestar" approach commonly employed in fee-shifting cases.[5] The "lodestar" approach stems from the Third Circuit's seminal decisions in *Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir.1973) (*"Lindy I"*), *appeal following remand*, 540 F.2d 102 (3d Cir.1976) (*"Lindy II"*). We agree that the Task Force Report's preference for a percentage of recovery approach makes sense in this common fund case.

As witnessed here, where a sudden and significant loss occurs to the price of publicly traded common stock, there is an almost instantaneous response from a skilled and highly entrepreneurial bar.[6] In this case, within a week of the FDA announcement that halved Bioscience's stock price, over two dozen suits were filed. Though we early consolidated these suits and plaintiffs ultimately filed an omnibus Consolidated Amended Complaint, no less than thirty-four firms appeared for thirty-five plaintiffs in these actions. There was, however, only one class certified.[7] From the point of view of the class, only the result matters—the number of law firms does not. By adopting a percentage of recovery fee, the number of plaintiffs' lawyers involved becomes irrelevant.

Almost as important, under a percentage regime the class's champions do not have the disincentive to early settlement that we regard as an inevitable and highly undesirable consequence of the lodestar approach. The Task Force Report's wisdom thus doubly applies well here.[8]

As the Task Force Report observed, when a lawyer in a common fund case secures a recovery for a class, and then seeks compensation from the same fund, the lawyer's role changes "from one of a fiduciary for the clients to that of a claimant against the fund created for the clients' benefit." 108 F.R.D. at 255. Thus, in such a circumstance, "[t]he perspective of the judge also changes because the court now must monitor the disbursement of the fund and act as a fiduciary for those who are supposed to benefit from it. . . ." *Id.* The Task Force Report therefore recommended that, as soon as possible, the court should appoint a negotiator "who will vigorously represent the interests of the beneficiaries [*i.e.,* the class]," and who will "behave in exactly the same fashion as would any other attorney in a comparable situation" in negotiating "in an open and appropriately arm's length manner" a reasonable compensation plan. 108 F.R.D. at 256–57.

While the Task Force Report's recommendation unquestionably will produce the kind of fee agreement refined by the rigors of the legal marketplace, at the beginning of this hotly-contested litigation that option did not seem to us to be available. In order to achieve the "appropriately arm's length man-

---

4. Panels of our Court of Appeals have, however, cited the Task Force Report without the expression of reservation. *See In re Busy Beaver Bldg. Ctrs.*, 19 F.3d 833, 849 (3d Cir.1994); *Rode v. Dellarciprete*, 892 F.2d 1177, 1191 (3d Cir.1990); *Student Pub. Interest Research Group v. AT & T Bell Lab.*, 842 F.2d 1436, 1450 (3d Cir.1988).

5. As the Supreme Court has noted, in 1983 there were "more than 150 existing federal fee-shifting provisions. . . ." *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 684, 103 S.Ct. 3274, 3277, 77 L.Ed.2d 938 (1983). That number is without question greater today.

6. The first suit here was filed before the close of trading on the first business day after the Food and Drug Administration's 6:00 p.m. January 31,

1992 statement that so shocked the market. As we have noted earlier, on this single day of trading over $320 million was lost in market capitalization. *In Re U.S. Bioscience Securities Litigation*, 806 F.Supp. 1197, 1201 (E.D.Pa. 1992).

7. Though one class was certified, it consisted of three distinct groups of investors who suffer when a common stock's price is said to have been unlawfully inflated: purchasers of the stock, buyers of puts, and sellers of calls.

8. A third reason also supports following the Task Force Report. With so many firms involved, avoidance of the lodestar approach also eliminates "the cumbersome, enervating, and often surrealistic process" of evaluating thirty-four fee petitions. Task Force Report, 108 F.R.D. at 258.

ner" that a sophisticated client would bring to a negotiation with a prospective lawyer, it seemed to us that the negotiator necessarily would have to be paid for his services. At least here, it was not realistic or reasonable to ask the defendants to fund any part of the cost of such a negotiator in a litigation in which they believed no claims would survive their motions under Fed.R.Civ.P. 12(b)(6). *See In re U.S. Bioscience Securities Litigation,* 806 F.Supp. 1197 (E.D.Pa.1992). This reality meant that only the plaintiffs' lawyers could provide the funds to pay for such a negotiator. A plaintiffs'-lawyer-paid patron seemed to us to present the kind of conflict of interest that would be intolerable in a judicial setting, and one that fair-minded people could reasonably conclude would *not* result in a fee arrangement that was achieved in an "appropriately arm's length manner".[9]

■ For these reasons, we appointed Judge Adams after the settlement fund had been created "to determine what contingent fee arrangement would likely be negotiated in the market in this District for legal services in business litigation similar to this Consolidated Action...." On May 23, 1994, Judge Adams filed his forty-nine page Report and Recommendation. By letter the next day, plaintiffs' co-lead counsel advised us that they had no objection to the Report and Recommendation.

In preparing his Report, the Special Master reviewed a number of affidavits and other documents detailing the fee percentages in other complex litigations. As Judge Adams points out in his Report, each of the other cases proffered differ in material respects from the one before the Court now. Far from being unhelpful, however,

> The Special Master concludes that this set of affidavits and documents is useful not so much in suggesting a specific fee percentage for this case, but rather in underscoring two fundamental aspects of the fee negotiation process: first, that the client's

needs and concerns are generally factored into any contingency fee agreement ..., and second, that many contingency fee agreements are, as the Task Force Report suggests, "custom-tailor[ed]" to the facts and circumstances, including the extent of the services actually provided by the attorneys.

Report and Recommendation at 24, quoting the Task Force Report at 108 F.R.D. at 256.

After carefully analyzing the particulars of this litigation, the Special Master concluded as follows with respect to the fee percentage:

> Virtually all the case law decisions and commentators agree that the contingent fee is to be based on the particular facts and circumstances of the specific litigation under consideration. The Special Master has carefully reviewed numerous other securities class action decisions, as well as the other materials provided, in an attempt to determine what the particular facts and circumstances of this matter would dictate, in terms of an appropriate contingency fee agreement and award. While the process is not scientific, and cannot be reduced to a mathematical formula, the Special Master concludes that a 30% fee award is appropriate in the circumstances here.

Report and Recommendation at 36.

With the benefit of perfect hindsight, the Special Master praised the conduct of plaintiffs' counsel in achieving the settlement of this litigation, stating:

> The Special Master has reviewed the settlement materials in detail, and believes that plaintiffs' counsel has been highly skillful in constructing a settlement that enables the stock of a seriously-threatened company to become an integral component of the settlement, and has done so in a way that both compensates plaintiffs for their injuries and enables U.S. Bioscience to continue to operate as a viable entity. The

---

9. There is at least one instance where such a Special Master negotiated a fee agreement in advance, and his report certainly shows no evidence of compromise because of the source of his compensation. *See* October 27, 1993 Report of the Special Master in *In Re U.S. Surgical*

*Corporation Securities Litigation,* No. 3:92CV00374 (AHN) (D.Conn.). We are informed, however, that the defendants in that litigation objected to the Special Master's Report, and those objections have not, as of this writing, been resolved.

settlement, under the circumstances of this case, is an outstanding achievement.[10] Report and Recommendation at 47.

Additionally, at our request the Special Master reviewed the proposed fee allocation as between co-lead counsel and other class counsel, embodied in an April 28, 1994 letter. The Special Master recommended that a split of 64% for co-lead counsel and 36% for the other plaintiffs' counsel should be approved. Report and Recommendation at 48.

Judge Adams has produced for us a meticulous and compelling Report which we have no hesitation approving. We believe that his recommendation has presented a fee percentage that would likely have been negotiated in the Philadelphia market for legal services in business litigation of this sort. Having done so, we believe his recommendation fully protects the class and assures those investors of the fairness of the fees to be awarded to the counsel who have, with exemplary skill, produced such an excellent settlement for their collective benefit.

*"Incentive Awards"*

▆ Plaintiffs' co-lead counsel have requested "incentive awards" of $5,000 to each of seven class representatives, and $2,500 to each of twenty-eight other class representatives. The seven are said to be entitled to double the others' awards because they were deposed and the others were not.

In support of this request, counsel assert that the class representatives "stepped forward as champion[s] of the class's interests and actively participated in the action." Plaintiffs' memorandum in support of joint petition, at 24. Specifically, counsel assert that the representative plaintiffs filed suit on behalf of the other plaintiffs, prepared and sat for depositions, and otherwise participated in discovery. *Id.* According to counsel, these actions not only furthered the interests of the class, but also "helped to effectuate the policies underlying the federal securities laws." *Id.*

We begin our analysis of this request with the well-established proposition that class representatives in class actions act as fiduciaries to the class. *In re Fine Paper Litigation,* 632 F.2d 1081, 1086 (3d Cir.1980) (citing *Girsh v. Jepson,* 521 F.2d 153 (3d Cir.1975)). In that capacity, they "undertake to represent not only themselves, but all members of the class, in a fiduciary capacity, and are obligated to do so fairly and adequately, and with due regard for the rights of those class members not present to negotiate for themselves." *Women's Committee for Equal Employment Opportunity (WE =EO) v. National Broadcasting Co.,* 76 F.R.D. 173, 180 (S.D.N.Y.1977).

This fiduciary status introduces concerns about whether the payment of any "awards" can be reconciled with the punctilio of fairness the fiduciary owes to the beneficiary. Thus, "where representative plaintiffs obtain more for themselves by settlement than they do for the class for whom they are obligated to act as fiduciaries, serious questions are raised as to the fairness of the settlements to the class." *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1148 (11th Cir.1983) (quoting *Plummer v. Chemical Bank,* 91 F.R.D. 434, 441–42 (S.D.N.Y.1981), *aff'd,* 668 F.2d 654 (2d Cir.1982)). For example, "[i]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interest they are appointed to guard." *Weseley v. Spear Leeds & Kellogg,* 711 F.Supp. 713, 720 (E.D.N.Y. 1989).

Many courts have approved the payment of incentive awards undeterred by this fidu-

---

**10.** Without in any way intending to diminish co-lead counsel's "outstanding achievement", the Special Master was not advised that the cash portion of the settlement was the product of protracted negotiations involving counsel for Bioscience, counsel for three layers of Bioscience's directors' and officers' liability insurers, and the Court. These insurers had disclaimed coverage under the policies, and the binding arbitration of that dispute was only weeks away when these negotiations successfully concluded with the insurers' $5,250,000 cash payment, together with Bioscience's and its officers' and directors' agreements not to look to those funds for the indemnification to which they would ordinarily be entitled under the policies. Given the seriousness of the policy defenses the insurers had interposed in the arbitration, fairness requires that their contribution, and that of Bioscience and its counsel, should not go unnoticed.

ciary constraint. *See, e.g., In re Scott Paper Company Securities Litigation,* Civil Action No. 90–6192 (E.D.Pa.1993); *In re Smith-Kline Beckman Corp. Securities Litigation,* 751 F.Supp. 525 (E.D.Pa.1990). Among the reasons courts cite for approving such awards are that representative plaintiffs (1) take on risks when commencing class action litigation [11] (2) shoulder heavier workloads than the other plaintiffs [12] and (3) help to secure substantial benefits to the class.[13] *Class Action Controversies,* Practicing Law Institute Litigation and Administrative Practice Course Handbook Series, PLI Order No. H4–5183 (March 21, 1994) (available on WESTLAW).

In securities class actions, incentive payments are also thought to encourage the enforcement of federal securities laws. *See In re SmithKline Beckman Corp. Securities Litigation,* 751 F.Supp. at 535 (approving incentive awards to representatives who "have rendered a public service by contribut-ing to the vitality of the federal Securities Acts"); *In re Continental/Midlantic Shareholders Litigation,* 1987 WL 16678, 1987 U.S.Dist. LEXIS 8070 (E.D.Pa.1987). More generally, cases approving such incentives "do so on a general, overall finding of fairness". *Scrutiny of the Bounty: Incentive Awards For Plaintiffs in Class Litigation,* 78 Ill.B.J. 286 (1990).[14]

The practice of approving incentive awards has recently attracted what seems to us to be trenchant and persuasive criticism. In *In the Matter of Continental Illinois Securities Litigation,* 962 F.2d 566 (7th Cir.1992), Judge Posner questioned whether incentive awards should *ever* be given to representative plaintiffs:

> The threshold question is whether a named plaintiff is ever entitled to a fee. The basis for an award of fees in a common-fund case is ... restitutionary, and the law of restitution (excepting salvage in admiralty) generally confines the right to resti-

---

**11.** *E.g.,* personal liability for litigation costs and lawyers' fees. For examples of other risks, *see In re Jackson Lockdown/MCO Cases,* 107 F.R.D. 703 (E.D.Mich.1985) (prison inmates who brought complaint about unjust treatment had valid fear of retaliation); *Women's Committee for Equal Employment Opportunity,* 76 F.R.D. 173 (plaintiffs who brought Title VII suit risked losing their jobs); *In re First Jersey Securities, Inc. Securities Litigation,* 1989 WL 69901 (E.D.Pa. June 23, 1989) (named plaintiff threatened with $5 million counter-suit).

**12.** Such as complying with discovery requests, appearing as witnesses: "Named plaintiffs and witnesses are entitled to more consideration than class members generally because of the onerous burden of litigation that they have borne." *Huguley v. General Motors Corp.,* 128 F.R.D. 81, 85 (E.D.Mich.1989), *aff'd,* 925 F.2d 1464 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 304, 116 L.Ed.2d 247 (1991).

**13.** An Ohio court used these three considerations in formulating a three-part test for determining whether to approve incentive awards. *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.,* 137 F.R.D. 240, 250 (S.D.Ohio 1991). That test suggests that courts consider "(1) the action taken by the Class Representatives to protect the interests of Class Members and others and whether these actions resulted in a substantial benefit to Class Members; (2) whether the Class Representatives assumed substantial direct and indirect financial risk; and (3) the amount of time and effort spent by the Class Representa-tives in pursuing the litigation." *Enterprise Energy Corp.,* 137 F.R.D. at 250.

**14.** In *Rewarding the Class Representative: An Idea Whose Time Has Come,* class action plaintiffs' lawyer Richard Greenfield composed a particularly exhaustive list of factors he believes courts should consider in assessing incentive awards. 9 *Class Action Reports* 4 (1986). Among these factors are "(a) the risk to the plaintiff in commencing suit, both financially and otherwise; (b) the notoriety and/or personal difficulties encountered by the representative plaintiff; (c) the extent of the plaintiff's personal involvement in the suit in terms of discovery responsibilities and/or testimony at depositions or trial; (d) the duration of the litigation; and (e) the plaintiff's personal benefit (or lack thereof) purely in his capacity as a member of the class." 9 *Class Action Reports* at 6.

Greenfield also noted several circumstances that he believes justify particularly high incentive awards. These factors are "(a) where a plaintiff subjected himself or his family to abuse at work or in his community for advocating a cause not universally acclaimed; (b) where the plaintiff assumed a disproportionately large financial risk in the context of his potential personal recovery; (c) where the plaintiff's personal privacy was invaded and/or subjected to public attention; and (d) where the plaintiff has had to testify at deposition or trial and/or has had to personally satisfy more than simple discovery obligations." *Id.* No evidence of such martyrdom has been proffered here except for the seven plaintiffs who testified at depositions.

tution to professionals, such as doctors and lawyers. 2 George E. Palmer, *The Law of Restitution*, ch. 10 (1978). If you dive into a lake and save a drowning person, you are entitled to no fee. The named plaintiff is not a professional; he is, at most, a public-spirited member of the class.

962 F.2d at 571. Judge Posner went on to refuse to award an incentive payment to the single named plaintiff after finding that the plaintiff had only been deposed for a few hours, and had borne only a "slight risk of being made liable for sanctions, costs, or other fees" had the suit gone "dangerously awry". *Id.* at 572. Judge Posner also justified his refusal to permit an award by noting that "if the named plaintiff had dropped out because he couldn't hope to be compensated for his modest efforts, there were plenty of others to take his place without demanding compensation." *Id.* at 572.[15]

We agree with Judge Posner that we cannot equate these investors with professionals "such as doctors and lawyers." The value of doctors' and lawyers' contributions are subject to readily available and objective benchmarks of reasonableness that the market supplies a court. No such objective referent exists for 10b–5 heroes. They are therefore not entitled to fees for lay service considerably less dangerous than diving into a lake to save a drowning victim.[16]

On the other hand, the plaintiffs did incur expenses, and perhaps lost wages, because of their involvement in this litigation. This loss is similar to what jurors suffer. Inasmuch as we believe that the juror *per diem* represents an objectively reasonable valuation for lay advancement of justice, we shall take Congress's appraisal of that service as our standard. *See* 28 U.S.C. § 1871(b)(1). Since

judicial time is better spent on matters other than evaluating vouchers for mileage, parking fees, and other expenses, we shall award round but modest sums calculated to err on the generous side to approximate reimbursement for such costs, in addition to a $40.00 *per diem*. Those who were deposed doubtless did invest more time and expense than those who merely approved and signed interrogatory answers, and so should be paid more for their presumed *per diem* fee. We shall therefore award $250.00 and $125.00, respectively.

An Order detailing all of the foregoing follows.

### ORDER

AND NOW, this 27th day of May, 1994, upon the application of plaintiffs' counsel, and upon consideration of the Special Master's Report and Recommendation to which there was no objection, and for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

1. The Report and Recommendation of the Special Master, The Honorable Arlin M. Adams, and his conclusion that the proper fee award should be 30% of the settlement fund, together with interest, and all costs incurred, is APPROVED and ADOPTED;

2. In accordance with the Report and Recommendation of the Special Master, the following counsel for plaintiffs are awarded the specified sums as attorneys' fees, interest thereon, and costs, with attorneys' fees to be paid in cash and units in the same proportion as the settlement fund is constituted, and interest and costs to be paid entirely in cash from the settlement fund:

| Law Firm Payee | Fee and Interest | Costs | Total |
|---|---|---|---|
| Berger & Montague, P.C | $1,596,269.25 | $ 88,828.06 | $1,685,097.31 |
| Savett Frutkin Podell & Ryan, P.C. | 1,339,843.71 | 312,340.79 | 1,652,184.50 |
| Abbey & Ellis | 32,861.61 | 2,783.39 | 35,645.00 |

**15.** The presence of thirty-five plaintiffs here bears out Judge Posner's undocumented identification of "plenty of others".

**16.** We also see no benefit in encouraging a frenzy of volunteers. While there was a simpler time when only one class representative was needed, in today's more complicated world of proliferating options contracts there probably needs to be at least three in each securities nondisclosure class action. There surely is no need, however, for thirty-five.

| Law Firm Payee | Fee and Interest | Costs | Total |
|---|---|---|---|
| Barrack, Rodos & Bacine | 117,122.39 | 4,444.84 | 121,567.23 |
| Law Offices of James Bashian | 9,092.00 | 16.67 | 9,108.67 |
| Berman, DeValerio & Pease | 51,289.46 | 3,238.91 | 54,528.37 |
| Bernstein Litowitz Berger & Grossmann | 106,720.74 | 4,231.42 | 110,952.16 |
| Kenneth A. Elan | 3,339.43 | 56.90 | 3,396.33 |
| Gold & Bennett | 55,419.98 | 5,011.73 | 60,431.71 |
| Goodkind, Labaton, Rudoff & Sucharow | 46,495.61 | 3,925.47 | 50,421.08 |
| Greenfield & Chimicles Liquidating Trust | 129,388.95 | 4,171.37 | 133,560.32 |
| Marguerite R. Goodman | 10,427.77 | –0– | 10,427.77 |
| Law Offices of Bernard M. Gross | 43,423.71 | 2,777.53 | 46,201.24 |
| Hoffman & Edelson | 59,096.53 | 1,037.95 | 60,134.48 |
| Kaplan, Kilsheimer & Fox | 14,862.54 | 555.95 | 15,418.49 |
| Kaufman Malchman Kirby & Squire | 13,007.89 | 1,191.41 | 14,199.30 |
| Lefrak & Holman, P.C. | 12,326.95 | 421.26 | 12,748.21 |
| Levin Fishbein Sedran & Berman | 6,392.71 | 9.00 | 6,401.71 |
| Law Offices of Donald B. Lewis | 67,847.50 | 3,934.29 | 71,781.79 |
| Lowey, Dannenberg, Bemporad & Selinger | 87,581.92 | 3,575.64 | 91,157.56 |
| Meredith & Cohen, P.C. | 38,533.75 | 2,478.25 | 41,012.00 |
| Milberg Weiss Bershad Hynes & Lerach | 79,014.02 | 7,889.15 | 86,903.17 |
| Pomerantz, Levy, Haudek, Block & Grossman | 101,032.29 | 7,841.35 | 108,873.64 |
| Rabin & Garland | 29,682.63 | 205.15 | 29,887.78 |
| Schiffrin & Craig, Ltd. | 41,973.21 | 2,535.01 | 44,508.22 |
| Silverman, Harnes, Obstfeld & Harnes | 50,029.10 | 1,954.33 | 51,983.43 |
| Spector & Roseman | 48,487.19 | 2,783.31 | 51,270.50 |
| Stull, Stull & Brody | 17,175.65 | 50.00 | 17,225.65 |
| Susman, Saunders & Buehler | 38,165.52 | 2,285.05 | 40,450.57 |
| Law Offices of Curtis V. Trinko | 13,320.29 | 2,305.13 | 15,625.42 |
| Wolf, Haldenstein, Adler Freeman & Herz | 26,870.24 | 685.83 | 27,556.07 |
| Wolf Popper Ross Wolf & Jones | 122,462.02 | 6,211.98 | 128,674.00 |
| Zlotnick & Thomas | 42,159.12 | 3,684.77 | 45,843.89 |
| Zwerling, Schachter & Zwerling | 135,727.00 | 5,757.56 | 141,484.56 |

3. The following named plaintiffs are each awarded $250.00 from the settlement fund:

a. John Kaufman;

b. Sandra Mindlin

c. Jeffrey Slemrod;

d. Lucille Fisher–Masters;

e. John J. Nittolo;

f. Harry Poloshjian; and

g. Stanley DeForge.

4. The following named plaintiffs are each awarded $125.00 from the settlement fund:

a. David F. Goldstein and Sylvia Goldstein;

b. Beatrice Goldman;

c. Fritz Kahlenberg;

d. Herman Moskowitz;

e. Dr. Sheldon Nadler;

f. Brian Baker;

g. Karl Fredericks;

h. James J. Hausberg;

i. Elaine Wacholder;

j. Henry Fey;

k. Marlene and Robert Sackheim;

l. Lola Flamm;

m. Joseph Lustman;

n. Dr. Robert Buonanno and Adolf Buonanno, Trustees;

o. Michael J. Freed;

p. Dr. Robert C. Schilling;

q. Feivel Gottlieb;

r. Richard Selig;

s. Louis D'Angelis;

t. Robert Claster;

u. Nancy Claster;

v. Constantine M. Boyagis, M.D.;

w. Leonard Brown;

x. Eugene Simonetti;

y. Doug and Jill Simmons;

z. Julie Mindlin Ventura;

aa. David Jaroslawicz; and

bb. Kevin Tolkin

5. The Special Master shall at his convenience submit his statement for services and reimbursement of out-of-pocket expenses, and this statement shall be paid from the settlement fund upon further Order of this Court.